# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON M. HARRISON,

    Plaintiff,

      v.

OFFICE OF THE ARCHITECT OF THE
CAPITOL,

    Defendant.

Civil Action No. 10-1480 (CKK)

## MEMORANDUM OPINION
(September 22, 2013)

Plaintiff Sharon Harrison, an employee of Defendant the Office of the Architect of the Capitol, filed suit alleging the Defendant subjected the Plaintiff to a hostile work environment and retaliated against the Plaintiff for engaging in protected activity, in violation of the Congressional Accountability Act, 2 U.S.C. § 1301 *et seq.* Presently before the Court is the Defendant's Motion for Leave to File Motion for Sanctions and the parties' cross-motions for summary judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court finds the Defendant is entitled to an adverse inference based on the Plaintiff's intentional destruction of evidence highly relevant to one of the Plaintiff's retaliation claims and her hostile work environment claim. Furthermore, the Court finds no reasonable jury

---

[1] The Court's decision is based on the record as a whole, but the Court's analysis focused on the following documents, listed in chronological order of filing: Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. [42]; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF Nos. [44, 46]; Def.'s Mot. for Leave to File Mot. for Sanctions, ECF No. [48]; Def.'s Mot. for Sanctions, ECF No. [48-3]; Def.'s Errata, ECF Nos. [49-51]; Pl.'s Opp'n to Mot. for Leave & Mot. for Sanctions, ECF No. [53]; Def.'s Opp'n to Pl.'s Mot. for Summ. J., ECF No. [54]; Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF Nos. [58-60]; Def.'s Reply in Support of Mot. for Summ. J., ECF No. [61]; Def.'s Reply in Support of Mot. for Leave & Mot. for Sanctions, ECF No. [62]; Pl.'s Reply, ECF Nos. [65, 66]; Def.'s Sur-reply, ECF No. [67].

could conclude that the Defendant retaliated against the Plaintiff because of the Plaintiff's protected activity, or that the Defendant subjected the Plaintiff to a hostile work environment. Accordingly, the Defendant's [48] Motion for Leave to File Motion for Sanctions is GRANTED, the Defendant's [48-3] Motion for Sanctions is GRANTED IN PART and DENIED IN PART, the Defendant's [44] Motion for Summary Judgment is GRANTED, and the Plaintiff's [42] Motion for Summary Judgment is DENIED.

## I. BACKGROUND

*A.     Chain of Command*

This action is the second of three lawsuits filed in this Court by the Plaintiff challenging various aspects of her employment with the Defendant.  The Plaintiff has been employed in the Training and Employee Development Branch of the Human Capital Management Division of the Architect of the Capitol since 2001.  Def.'s Stmt. ¶ 1.[2]  The Plaintiff is currently employed as a human resources specialist at the GS-12 level.  *Id.*  The Plaintiff's responsibilities include managing training courses and arranging training courses in other jurisdictions, which may involve soliciting proposals from vendors and sending selection notices to participants.  Def.'s Ex. 1 (Harrison Dep.) at 9:2-6.  Between 2004 and September 2009, the Plaintiff reported to Stephen Hayleck, the Chief of the Training Branch.  *Harrison v. Office of the Architect of the Capitol* ("*Harrison I*"), --- F. Supp. 2d ---, 2013 WL 4676110, at *1 (D.D.C. Sept. 1, 2013). Rebecca Tiscione, the Director of Human Resources, served as the Plaintiff's second-line

---

[2]    The Court shall refer to Defendant's Corrected Statement of Material Facts ("Defs.' Stmt."), ECF No. [50-1], to the Plaintiff's Statement of Material Facts ("Pl.'s Stmt."), ECF No. [42], or directly to the record, unless a statement is contradicted by the opposing party, in which case the Court may cite to Plaintiff's Response to the Defendant's Statement of Material Facts ("Pl.'s Resp. Stmt."), ECF No. [63-2], or to the Defendant's Response to the Plaintiff's Statement of material Facts, ECF No. [54-1], where appropriate.

supervisor, and David Ferguson was the Plaintiff's third-line supervisor. *Id.*

Following Mr. Hayleck's departure from the Defendant in September 2009, Laurie Drake and Amy Heslep rotated in the position of Acting Chief of the Training Branch. Def.'s Stmt. ¶ 2. The Chief of the Training Branch is the Plaintiff's first-line supervisor. *See Harrison I*, 2013 WL 4676110, at *1. Ms. Drake, at the time a GS-13 Human Resources Specialist, worked for the Capitol Visitor Center, a division of the Architect of the Capitol. Def.'s Ex. 3 (Drake Dep.) at 11:10-13:4. Ms. Heslep, also a GS-13 Human Resources Specialist, worked in the Training Branch with the Plaintiff. Def.'s Ex. 5 (Heslep Decl.) ¶ 1. Ms. Heslep served as acting Chief for approximately six weeks in October and early November 2009. Def.'s Stmt. ¶ 4. During this time, Ms. Heslep conferred with Ms. Drake regarding management of the Training Division. Drake Dep. 17:20-18:1. Ms. Drake became acting Chief in November 2009, and retained the position until March 2010. *Id.* 16:22-17:5. Ms. Drake conferred with Ms. Heslep regarding management of the Training division during Ms. Drake's tenure as acting Chief. *Id.* 18:2-4. Ms. Heslep then served as acting Chief for six additional weeks, from March 19 until May 2010. Heslep Decl. ¶ 2. Thus, between October 2009 and May 2010, Ms. Heslep or Ms. Drake served as the Plaintiff's first-line supervisor. Linda Poole took over as acting Chief in May 2010, and Peggy Hernandez became the Chief of the Training Branch in September 2010. Harrison Dep. 11:23-12:4.

The Chief of the Training Division reports to the Chief Human Capital Officer, who at all times relevant to this case was Teresa Bailey. Def.'s Ex. 6 (Ferguson Dep.) at 16:20-17:4. Ms. Bailey, the Plaintiff's second-line supervisor, reported to the Deputy Chief Administrative Officer Dan Cassil. *Id.* 16:18-22. Mr. Cassil, the Plaintiff's third-line supervisor, reported to David Ferguson, the Chief Administrative Officer for the Architect of the Capitol. *Id.* 15:20-22.

*B.    Factual Background*

The Court detailed the events preceding the Plaintiff's initial lawsuit in the *Harrison I* decision.  In short, following two "incidents" involving Mr. Hayleck in August and September 2008, the Plaintiff took extended leave from her position on September 30, 2008.  *Harrison I*, 2013 WL 4676110, at *1-2.  The Plaintiff returned to work on February 19, 2009, but was temporarily detailed to a different division within the Human Capital Management Division.  *Id.* at *3.  In May, Ms. Tiscione informed the Plaintiff that her temporary detail would end on June 17, 2009.  Pl.'s Stmt. ¶ 1.  The Plaintiff was reassigned to the Training Branch on June 22, 2009, but at that time did not return to the physical office for the Training Branch, which is located in the basement of the Ford House Office Building.  Second Harrison Decl., ECF No. [59], ¶ 3.  Rather, between June 22 and October 5, 2009, the Plaintiff worked for the Training Branch from the second floor of the Ford House Office Building.  *Id.* ¶ 4.  Following Mr. Hayleck's departure, the Plaintiff returned to the Training Branch Office.  *Id.* ¶ 5.

1.    <u>Plaintiff's Requests for Counseling</u>

The Congressional Accountability Act provides that in order to commence a proceeding under the Act, an employee alleging a violation must file a request for counseling.  2 U.S.C. § 1402(a).  No more than 15 days after the employee receives notice of the end of the counseling period, the employee must file a request for mediation.  *Id.* § 1403(a).  Once the employee has completed both counseling and mediation, the employee may either file a complaint with the Office of Compliance or file a civil action in Federal court.  *Id.*; *id.* § 1404.  The Act further provides that in cases involving employees of the Office of the Architect, upon a receipt of a request for counseling, the Office of Compliance can recommend that the employee use the grievance procedures for the Architect of the Capitol.  *Id.* § 1401.  The Equal Employment

4

Opportunity and Conciliation Programs Division of the Architect of the Capitol ("EEO/CP") handles claims referred from the Office of Compliance. Pl.'s Ex. 3 (Conciliation Program) at 4-6. Rule 2.03(m) of the Procedural Rules for the Office of Compliance for the Architect of the Capitol provides that once referred to the internal grievance procedures, the employee may return to the counseling and mediation process "within 60 days after expiration of the period recommended by the [Office], if the matter has not resulted in a final decision," or "within 20 days after service of a final decision resulting from the grievance procedures." Pl.'s Ex. 1 (Procedural Rule 2.03). Throughout 2009 and 2010, the Plaintiff submitted seven requests for counseling to the Office of Compliance, which are outlined below.

### a. Case No. 09-AC-47

Initially, on February 6, 2009, the Plaintiff submitted a request for counseling, which was assigned case number 09-AC-47. Def.'s Ex. 15-A (Gantt Decl. Ex. A) at 2. The Plaintiff alleged that among other things, she was subjected to a hostile work environment based on her sex and in retaliation for invoking her rights under the Family and Medical Leave Act. *Id.* at 3. The Plaintiff completed counseling and mediation regarding this request. *Id.* at 2. This request for counseling formed the basis for the *Harrison I* lawsuit. *Harrison v. Office of the Architect of the Capitol*, No. 09-1364, Compl. (D.D.C. filed July 23, 2009).

### b. Case No. 09-AC-80

Second, in response to the Defendant's decision to terminate the Plaintiff's temporary detail, on May 29, 2009, the Plaintiff submitted a formal request for counseling with the Office of Compliance for the Architect of the Capitol and designated Bill Strawderman as her representative. Pl.'s Stmt. ¶ 6; Def.'s Ex. 15-B (Gantt Decl. Ex. B) at 3. This request was assigned case number 09-AC-80. Pl.'s Stmt. ¶ 6. The Office of Compliance recommended that

the Plaintiff utilize the grievance procedures of the Architect of the Capitol for a period of time not to exceed 90 days.  Gantt Decl. Ex. B at 3.  Between June 18 and August 10, 2009, Bill Strawderman exchanged a number of emails with Edwin Lopez, an Equal Employment Opportunity Specialist with the "EEO/CP", regarding the Plaintiff's proposed remedies for her grievance, and met in person with Mr. Lopez and Ms. Tiscione to discuss the Plaintiff's claims. Strawderman Decl. ¶¶ 9-11.  Ms. Tiscione disagreed with the proposal offered by the Plaintiff through Mr. Strawderman.  Pl.'s Ex. 15 (08/12/09 Email R. Tiscione to E. Lopez).  Mr. Strawderman then sought to arrange a meeting with the Architect of the Capitol Stephen Ayers, but Mr. Lopez indicated that he was not sure as to whether EEO/CP "should be involved in the effort to engage Mr. Ayers at this juncture" because Mr. Ayers "is AOC management and will ultimately be the deciding official in this matter."  Pl.'s Ex. 17 (9/3/09 Email E. Lopez to B. Strawderman); Strawderman Decl. ¶¶ 13-15.  On October 27, 2009, Mr. Lopez, in his capacity as the acting Director of the EEO/CP, sent a letter to Mr. Strawderman indicating that because the positions of the parties have not changed, Mr. Lopez did not "envision a final resolution of this matter utilizing the AOC internal grievance procedures."  Pl.'s Ex. 24 (10/27/09 Ltr. E. Lopez to B. Strawderman).  Mr. Lopez indicated that EEO/CP would not take any further action regarding the allegations in the request for counseling, and referred Mr. Strawderman to the June 3 letter from the Office of Compliance for further guidance.  *Id.*  The June 3 letter set forth the time limits outlined in Rule 2.03(m) for returning to counseling with the Office of Compliance after engaging in grievance procedures with EEO/CP.  Gantt Decl. Ex. B at 3.

In response to Mr. Lopez's October 27 letter, Mr. Strawderman emailed Mr. Lopez, inquiring as to whether the October 27 letter represented a "final decision" for purposes of Rule 2.03(m).  Pl.'s Ex. 25 (11/10/09 Email B. Strawderman to E. Lopez).  Mr. Lopez indicated that

the October 27 letter was a final decision. Pl.'s Ex. 27 (11/16/09 Email E. Lopez to B. Strawderman). The Office of Compliance indicates that the Plaintiff's request for counseling was "returned from the internal procedures" on November 3, 2009. *Id.* at 2. The Office notified the Plaintiff that the counseling period ended on December 2, 2009, but the Plaintiff did not file a request for mediation. *Id.*

c.    Case No. 10-AC-23

The Plaintiff filed a third request for counseling on November 12, 2009, which was assigned case number 10-AC-23. Gantt Decl. Ex. C at 2. The request alleged the Plaintiff was subject to "harassment, discipline, and unfair terms and conditions of employment because of reprisal." *Id.* at 3. The Plaintiff completed the counseling and mediation process on June 3, 2010. *Id.* at 2.

d.    Case No. 10-AC-28

The Plaintiff's fourth request for counseling, submitted December 3, 2009, was assigned case number 10-AC-28. Gantt Decl. Ex. D at 2. The claim "alleg[ed] hostile work environment and denial of terms and conditions of employment because of reprisal." *Id.* at 3 (1/21/10 Notice of Invocation of Mediation). The Plaintiff completed counseling and mediation with respect to this request on June 3, 2010.

e.    Case No. 10-AC-55

The Plaintiff submitted a fifth request for counseling on March 15, 2010, alleging "unfair terms and conditions, discipline, and a hostile work environment because of reprisal." Gantt Decl. Ex. E at 3 (3/31/10 Notice of Invocation of Mediation). The request was assigned case number 10-AC-55. *Id.* at 2. The Plaintiff completed counseling and mediation on June 3, 2010. *Id.*

7

f.      Case No. 10-AC-56

The Plaintiff's sixth request for counseling was submitted on March 17, 2010, and assigned case number 10-AC-56.  Gantt Decl. Ex. F at 2.  The request for counseling alleged the Plaintiff was subjected to "unfair terms and conditions and a hostile work environment because of reprisal."  *Id.* at 3 (3/31/10 Notice of Invocation of Mediation).  The Plaintiff completed counseling and mediation regarding this claim on June 3, 2010.  *Id.* at 2.

g.      Case No. 10-AC-73

Finally, the Plaintiff submitted her seventh request on April 28, 2010, which concerned purportedly "unfair discipline and hostile work environment" based on the Plaintiff's exercise of her rights under the Family and Medical Leave Act "and reprisal."  Gantt Decl. Ex. G at 2, 3 (6/3/10 Notice of Invocation of Mediation).  The Plaintiff completed the counseling and mediation process for her seventh request on July 10, 2010.  *Id.* at 2.

2.      Digital Recorder Incident

The Training Branch Office in the basement of the Ford House Office Building contained three desks, for the Plaintiff, Ms. Heslep, and Kristy Miller respectively.  Ms. Miller was a GS-11 Human Resources Specialist with the Training Branch.  Def.'s Ex. 4 (Miller Dep.) at 17:11-20.  Leading up to October 29, Ms. Miller and Ms. Heslep observed the Plaintiff engage in what they considered to be suspicious behavior.  For example, the Plaintiff would implement changes to improve her work performance that Ms. Heslep and Ms. Drake had discussed in private but had not yet raised with the Plaintiff.  Heslep Dep. 50:4-18.  Ms. Heslep observed employees from other divisions entering the Training Branch Office under the guise of looking for another individual or dropping off the mail, and hand files to the Plaintiff.  *Id.* at 51:16-53:16.  The Plaintiff would also often leave the office for extended periods of time with no explanation.  *Id.*

at 72:19-73:19.

On October 29, 2009, the Plaintiff entered the Training Branch Office and announced that she would hang her coat on the coat rack between Ms. Heslep's and Ms. Miller's desks before placing her coat on the rack and leaving the office. Def.'s Stmt. ¶ 8. Ms. Miller and Ms. Heslep thought it was strange that the Plaintiff would announce where she intended to hang her coat. Miller Dep. 38:6-12; Heslep Dep. 78:8-17. Ms. Miller and Ms. Heslep also thought the Plaintiff's conduct was odd because the Plaintiff usually hung her coat on the back of her office chair. Def.'s Stmt. ¶ 7. Later in the day, Ms. Miller and Ms. Heslep discussed the Plaintiff's pronouncement, and joked that perhaps the Plaintiff placed her coat between their desks in order to record Ms. Miller and Ms. Heslep's conversations. Def.'s Stmt. ¶ 9; Miller Dep. 38:13-17. Ms. Miller remarked that she was "just waiting for the tape recorder to go click," then jokingly patted the Plaintiff's coat, discovering a bulky object in the Plaintiff's coat pocket. Miller Dep. 38:17-21; Def.'s Stmt. ¶ 10. Ms. Miller then unzipped the coat pocket and discovered a digital recorder. Miller Dep. 38:17-21. Ms. Miller identified the recorder as a white, Olympus-brand voice-activated digital recorder. *Id.* 47:3-6. When she removed the recorder from the Plaintiff's coat pocket, Ms. Miller noticed that the numbers on the digital display were moving. *Id.* Ms. Miller placed the recorder on Ms. Heslep's desk, and Ms. Heslep took a picture of the device with her cellphone. Def.'s Stmt. ¶ 11. Ms. Heslep attempted to turn off the device, and then returned it to the Plaintiff's coat pocket. Heslep Dep. 5:11-12; Def.'s Stmt. ¶ 11.

Ms. Miller and Ms. Heslep proceeded to contact the Capitol Police, Laurie Drake, and a number of individuals in their chain of command that day and the following day (October 30) to discuss the incident. Def.'s Stmt. ¶¶ 12-17. Dan Cassil and Teresa Bailey met with the Plaintiff on October 30, and asked whether the Plaintiff brought a tape recorder to the office. Def.'s Stmt.

¶ 18. The Plaintiff admitted that she did, and stated that the she brought the recorder so that she could record her thoughts for use during her psychotherapy. *Id.* ¶ 19. Mr. Cassil and Ms. Bailey informed the Plaintiff that the Rules of the House of Representatives prohibited the use of recording devices, including in the Ford Office Building where the Plaintiff worked. *Id.* At some point after the meeting with the Plaintiff, Mr. Cassil and Ms. Bailey met with Ms. Heslep and Ms. Miller separately, and verbally counseled both individuals for touching the Plaintiff's private property. *Id.* ¶ 21

Prior to the Plaintiff's deposition on August 25, 2011, the Defendant submitted a discovery request for the recording device. Harrison Dep. 27:14:16. The Plaintiff testified that when the Defendant made its request for the device, the Plaintiff "took a hammer and [] hit it and [] destroyed it and [] broke it up in pieces and [] threw it away." *Id.* 27:3-5; 31:17-25. The Plaintiff also disposed of the instruction book for the recorder. *Id.* 36:8-18. The Plaintiff claims to have made a copy of the conversation between Ms. Miller and Ms. Heslep at the time they discovered the recorder in the Plaintiff's coat, and produced a copy of the recorded conversation to the Defendant. *Id.* 28:16-29:13. When asked why she destroyed the device, the Plaintiff explained that the recorded conversation on the device "was depressing" and the Plaintiff "didn't want it around." *Id.* 28:9-20. The Plaintiff denies that the recording device was voice activated. *Id.* 32:16-21; 35:23-36:7.

### 3. Supervision of the Plaintiff

Ms. Heslep and Ms. Drake testified that during their respective tenures as acting Chief of the Training Branch, they "coach" the Plaintiff on a daily basis in order to improve her work performance. Def.'s Stmt. ¶ 24; Heslep Dep. 39:2-10. For example, Ms. Heslep explained that the Plaintiff was having difficulty making the determination as to whether a training course was

related to the position of the individual requesting the training. Heslep Dep. 36: 11-18. In order to assist the Plaintiff with this process, Ms. Heslep would suggest questions the Plaintiff could pose to the employee and refer the Plaintiff to the position description and the course outline. *Id.* at 36:19-37:9. Ms. Heslep would also provide the Plaintiff with checklists and templates to improve her performance and attend the Plaintiff's meetings with customers and provide feedback to the Plaintiff. *Id.* at 39:14-40:19. The Plaintiff does not dispute that Ms. Heslep and Ms. Drake provided this informal coaching, but argues that the Plaintiff only had two formal meetings with her supervisors during this time frame. Pl.'s Resp. Stmt. ¶¶ 24, 29.

On March 8, 2010, Ms. Drake issued a proposed reprimand to the Plaintiff regarding several instances in which the Plaintiff delayed reviewing and sending out contracts and issuing other forms, and extended deadlines without approval of her supervisor. Def.'s Ex. 9 (3/8/10 Proposed Reprimand). Consistent with the Defendant's procedures, the Plaintiff submitted a written response to David Ferguson, attributing the delay to inclement weather. Pl.'s Ex. 32 (3/16/10 Ltr. S. Harrison to D. Ferguson). Mr. Ferguson ultimately withdrew the proposed reprimand. Pl.'s Ex. 33; Def.'s Ex. 11 (7/14/10 Ltr. D. Ferguson to S. Harrison). Mr. Ferguson cautioned the Plaintiff that "future conduct of the type described in the proposal will be considered a serious departure from [her] obligation to adhere to the Standards of Conduct and will result in appropriate disciplinary action." *Id.*

As the acting Chief of the Training Branch, Ms. Drake completed the Plaintiff's performance review for the period of October 1 to December 31, 2009. Pl.'s Ex. 36 (Pl.'s Performance Review) at 1. Ms. Drake rated the Plaintiff's performance as unacceptable in the areas of (1) communication, collaboration, and/or liaison; (2) training advisory services; and (3) training policy and review analysis. *Id.* at 1-2. The review identified a number of issues with the

Plaintiff's work performance, including that the Plaintiff "attempts to pass tasks off to her supervisor or to coworkers if she cannot resolve them in her first attempt," "delivers poorly written work products," "is inconsistent in her application of training policies," and "has had some difficulty processing her work on time." *Id.* On March 29, 2010, Ms. Heslep issued a "Performance Improvement Plan" or "PIP" for the Plaintiff. Pl.'s Ex. 37 (3/29/10 PIP). The PIP provided a detailed outline of the areas of the Plaintiff's performance considered deficient, specific steps the Plaintiff would be expected to take to improve her performance in each of those areas, and the steps the supervisors would take to assist the Plaintiff. *See generally id.* The plan indicated that if the Plaintiff failed to achieve a "fully successful" performance rating within sixty days, or achieved that level but failed to sustain it for a reasonable period of time, the Plaintiff would be demoted or removed from her position. *Id.* at 1. The following day, the Plaintiff took an extended period of sick leave, and did not return to work until June 22, 2010. Pl.'s Exs. 39-40. Teresa Bailey withdrew the PIP on April 30, 2010, noting that due to the Plaintiff's sick leave, the Defendant had not been able to observer her work performance. Pl.'s Ex. 40 (4/30/10 Ltr. T. Bailey to S. Harrison). Ms. Bailey indicated the PIP would be reinstated upon the Plaintiff's return. *Id.* Ultimately Ms. Bailey elected not to reinstate the PIP when the Plaintiff returned to work because the new acting Chief of the Training Branch, Linda Poole, was not familiar with the Plaintiff's past performance. Def.'s Ex. 7 (Bailey Dep.) at 55:3-20.

4.    Access to the Plaintiff's Email

In early March 2010, Ms. Heslep and Ms. Drake approached Sherry Richardson with the Information Security Division of the Architect of the Capitol in order to determine the protocol for obtaining authorized access to an employee's email "just in case there was an occasion for an extended absence or a period of time like that." Drake Dep. 32:5-11; Heslep Dep. 115:3-9. Ms.

Drake explained that the inquiry was not targeted towards any particular individual, but rather was a "general" question "in case [Plaintiff] went out or [Ms. Miller] went out or something . . . [b]ecause there were no procedures in place that we could find." Drake Dep. 32:1-17.

When Ms. Drake and Ms. Heslep initially approached Ms. Richardson, there was one other individual in the office for the Information Security Division, but the individual was asked to leave. Drake Dep. 34:22-14. Someone subsequently sent an anonymous letter to the Plaintiff's home address, alleging that on March 3, 2010, Ms. Drake and Ms. Heslep contacted Sherry Richardson inquiring "how it would be possible to gain access to Sharon Harrison's (your) computer to see what she (you) is doing on it." Pl.'s Ex. 35 at 2. The letter indicated the author didn't know "who [was] behind this attempt to violate [the Plaintiff's] privacy or if they acted on their own," but that that information came to the author's attention, she would "certainly contact [Plaintiff] with any and all names." *Id.* The letter was signed "A Friend." *Id.*

The Office of the Inspector General ("OIG") conducted an investigation into the anonymous letter. As part of the investigation, OIG interviewed Ms. Heslep regarding the March 3 conversation. *See* Pl.'s Ex. 57 (4/8/10 Interview Tr.). Ms. Heslep explained during the interview that she and Ms. Drake approached Ms. Richardson because they suspected someone else was doing the Plaintiff's work, but after speaking with Ms. Richardson decided not to pursue the issue unless there was another incident that led the supervisors to believe someone else was completing the Plaintiff's work. *Id.* at 34:9-14.

When the Plaintiff took leave on March 30, 2010, her psychiatrist indicated the Plaintiff would be re-evaluated on April 20, 2010. Pl.'s Ex. 38 (3/10/10 Ltr.). In early April, Ms. Heslep submitted a written request to Ms. Bailey for access to the Plaintiff's email in order to complete certain training requests that were outstanding when the Plaintiff left on sick leave. Heslep Dep.

107:11-108:16. Ms. Bailey approved the request, and submitted it to the Information Security Division, which provided Ms. Heslep with access to the Plaintiff's Outlook email. *Id.* at 108:20-110:5. The Complaint does not allege that the decision to provide Ms. Heslep access to the Plaintiff's email account while the Plaintiff was on sick leave was retaliatory.

C.    *District Court Proceedings*

The Plaintiff filed the complaint in *Harrison I* on July 23, 2009, alleging the Defendant subjected the Plaintiff to a hostile work environment based on her gender, her opposition for violations of the Occupational Safety and Health Act of 1970, her exercise of rights under the Family and Medical Leave Act, and in retaliation for protected activity. Following discovery, the Court granted summary judgment in favor of the Defendant on all counts. *See generally Harrison I*, 2013 WL 4676110. The Plaintiff filed this action on August 31, 2010. *See generally* Compl., ECF No. [1]. The Complaint sets forth six claims. Count I alleges the search of the Plaintiff's coat by Ms. Miller and Ms. Heslep was unlawful retaliation for the Plaintiff's protected activities under the Congressional Accountability Act. *Id.* ¶¶ 118-23. Count II asserts that the Defendant's violation of Procedural Rule 2.03(m) when processing the Plaintiff's Request for Counseling in case number 09-AC-80 was unlawful retaliation for the Plaintiff's protected activities. *Id.* ¶¶ 124-29. Count III alleges the March 8, 2010, proposed reprimand was unlawful retaliation for the Plaintiff's protected activities. *Id.* ¶¶ 130-35. Count IV alleges the March 3, 2010, inquiry by Ms. Drake and Ms. Heslep regarding the protocol for accessing the Plaintiff's email was unlawful retaliation for the Plaintiff's protected activities. *Id.* ¶¶ 136-41. Count V claims the Defendant retaliated against the Plaintiff because of her protected activities by issuing the Performance Improvement Plan on March 29, 2010. *Id.* ¶¶ 142-47. Finally, in Count VI of the Complaint, the Plaintiff alleges the Defendant subjected her to a

retaliatory hostile work environment.  *Id.* ¶¶ 148-53.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
>
> > (A) citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information,
> > affidavits or declarations, stipulations (including those made for
> > purposes of the motion only), admissions, interrogatory answers,
> > or other materials); or
> >
> > (B) showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot
> > produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  When

considering a motion for summary judgment, the court may not make credibility determinations

or weigh the evidence; the evidence must be analyzed in the light most favorable to the

nonmoving party, with all justifiable inferences drawn in her favor.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986).  "If material facts are at issue, or, though undisputed, are

susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*,

571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The moving party bears the burden of demonstrating the absence of a genuine issue of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The mere existence of a

factual dispute, by itself, is insufficient to bar summary judgment.  *See Liberty Lobby*, 477 U.S.

at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).

## III. DISCUSSION

### A.   *Defendant's Motion for Leave to File Motion for Sanctions*

Two weeks after the parties filed their cross-motions for summary judgment, the Defendant filed a motion seeking leave to file a motion for sanctions against the Plaintiff for destroying the digital recorder. The Court ordered the parties to simultaneously brief the Defendant's request for leave to file and the proposed motion for sanctions. 3/21/12 Minute Order. The Court deferred consideration of the motion until the parties' dispositive motions were fully briefed so as to allow the Court to determine what if any relevance the recorder has to this case. With all motions now fully briefed, the Defendant's motion(s) is ripe for consideration.

The Plaintiff argues that the Court should deny the Defendant leave to file the proposed motion for sanctions because the Defendant learned that the recorder was destroyed during the Plaintiff's deposition on August 25, 2011, but did not file the motion until March 20, 2012, "eleven days short of six months subsequent to the ending of the discovery period." Pl.'s Opp'n to Mot. for Leave & Mot. for Sanctions at 1. This argument is misplaced for several reasons.

16

First, although discovery was initially set to close on September 30, 2011, the Court extended the deadline to January 9, 2012. 12/9/11 Minute Order. Second, the Plaintiff did not articulate any prejudice from the delay in filing, nor is any prejudice discernible from the record, particularly because the facts surrounding Plaintiff's destruction of the evidence are undisputed. Third, it is not clear that the Defendant's motion is a discovery-related motion such that the Defendant was required to file it before the close of discovery. The motion does not seek additional discovery, but rather seeks dismissal of one of the Plaintiff's claims because certain evidence is no longer available. Fourth, the actual relevance of the recorder to the Plaintiff's claims would not have been clear until the parties filed their respective dispositive motions. The Defendant promptly filed the motion for sanctions once the Plaintiff filed her motion for summary judgment. Therefore, the Court shall grant the Defendant leave to file the motion for sanctions. Because the motion for sanctions itself has been fully briefed by the parties, the Court turns to the merits of the Defendant's request for sanctions.

"A district court may order sanctions, including a default judgment, for misconduct . . . pursuant to the court's inherent power to protect [its] integrity and prevent abuses of the judicial process." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (citation omitted). The Defendant further argues in this case sanctions can be imposed pursuant to Federal Rule of Civil Procedure 16(f) for failure to obey the Court's scheduling order. Fed. R. Civ. P. 16(f)(C) ("On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii), if a party or its attorney[]fails to obey a scheduling or other pretrial order.").

The Defendant specifically asks the Court to dismiss Count I of the Complaint as a sanction for the Plaintiff's destruction of the recording device. Sanctions in the form of

dismissal may be warranted if (1) the moving party "has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case"; (2) if the misconduct put "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay"; or (3) the Court needs "to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future." *Shea v. Donohoe Construction Co.*, 795 F.2d 1071, 1074-77 (D.C. Cir. 1986); *accord Webb*, 146 F.3d at 971. "A sanction imposed pursuant to any of these considerations must be based on findings supported by the record." *Webb*, 146 F.3d at 971

The obligation to preserve relevant evidence is certainly implied in the Court's Scheduling and Procedures Order, ECF No. [11], but out of an abundance of caution the Court shall consider the Defendant's request under the Court's inherent authority to sanction parties for misconduct. The Plaintiff readily admitted during her deposition that she knew she had an obligation to maintain "all evidence that's relevant to [her] claims," but when defense counsel specifically requested the recorder be produced, the Plaintiff used a hammer to break up the recorder into pieces, and then disposed of the recorder and the operating manual. The Plaintiff argues that the recording device is immaterial because it "only validates that which was made known by the Defendant pursuant to the admissions of Acting Chief Heslep and co-worker Miller." Pl.'s Opp'n to Mot. for Leave & Mot. for Sanctions at 4. Yet in the very next sentence the Plaintiff argues that "[t]here is no evidence or proof the Plaintiff at any time surreptitiously taped" her co-workers. *Id.* In her pleadings the Plaintiff repeatedly criticizes the Defendant for relying solely on the deposition testimony of Ms. Miller and Ms. Heslep concerning this incident, Pl.'s Resp. Stmt. ¶¶ 5-10, but the Defendant is forced to do so because the Plaintiff herself intentionally destroyed the evidence that might have verified this testimony. The Court

18

(and the jury) will never know if the Plaintiff was actually taping her co-workers' conversations without their consent because the Plaintiff *destroyed the device on which the conversations would have been recorded*. Admittedly, the Plaintiff provided the Defendant with a copy of a conversation purportedly recorded by the device, but the Defendant has been deprived of the opportunity to authenticate the recording, and to determine (among other things) (1) whether the device was voice-activated; (2) whether the device recorded any other conversations between the Plaintiff's co-workers; and (3) whether the Plaintiff was using the device as part of her psychotherapy. The first two issues are particularly relevant to the fact finder's determination of whether the Defendant's stated reason for searching the Plaintiff's coat was a pretext for retaliation, a key element of the Plaintiff's claim in Count I of the Complaint.

Apart from the clear prejudice to the Defendant that the Plaintiff's misconduct caused, there is a clear need for sanctions to deter future misconduct, both by the Plaintiff and other parties appearing before the Court. The Plaintiff was no stranger to litigation. By the time the misconduct occurred in the summer of 2011, the parties had already completed discovery in *Harrison I*, and the Plaintiff had filed a third lawsuit against the Defendant in this matter. The Plaintiff not only knew that she had an obligation to maintain relevant evidence, she also knew the Defendant had specifically asked to examine the recorder. Nevertheless, the Plaintiff intentionally destroyed the recording device, depriving the Defendant of the opportunity to examine it. Some sanction is necessary to deter the Plaintiff from engaging in discovery misconduct in connection with her third suit, and to deter future litigants from intentionally destroying evidence directly relevant to their affirmative claims.[3]

---

[3] Moreover, the Court is skeptical of the Plaintiff's stated reason for destroying the recording device. The Plaintiff testified that she destroyed the device because the conversation

That being said, the question is what sanction is appropriate in light of the Plaintiff's misconduct. "When sanctions are ordered under the court's inherent power, the need to consider less onerous alternatives stems from the intrinsic need for self-restraint in using so powerful a weapon." *Webb*, 146 F.3d 964. An adverse inference regarding the Plaintiff's use of the recording device is an appropriate sanction in this case. The recording device is relevant to Count I of the Complaint, but the crux of the Plaintiff's claim is the search that revealed the recorder was in the Plaintiff's coat. Thus, dismissing the claim in its entirety would be disproportionate to the prejudice to the Defendant caused by the Plaintiff's misconduct. However, the recording device was the Defendant's best opportunity to present direct evidence that the proffered reason for searching the Plaintiff's coat was not pretextual, therefore a strong adverse inference is appropriate. *Talavera v. Shah*, 638 F.3d 303, 312 (D.C. Cir. 2011) (holding the District Court erred in finding the plaintiff was entitled only to a "weak adverse inference" of spoliation in light of the defendant's negligent destruction of evidence relevant to the issue of pretext). Accordingly, as a sanction for the Plaintiff's misconduct, in resolving the parties' cross-motions for summary judgment the Court shall assume that the recording device would have revealed the Plaintiff was intentionally taping conversations between her co-workers without their consent.

---

between Ms. Miller and Ms. Heslep allegedly that was recorded on the device "was depressing" insofar as Ms. Miller called the Plaintiff an expletive. Harrison Dep. 28:10-25. The conversation reportedly took place on October 29, 2009, the Plaintiff listened to the recording on October 30, 2009, Pl.'s Stmt. ¶ 64, and the Plaintiff maintained possession of the recorder after that point, but she did not erase the conversation and did not destroy the device until the summer of 2011, and even then only after she received the Defendant's request for the device. In any event, a finding of bad faith is not necessary to warrant the sanction adopted by the Court in this case. *E.g.*, *Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 31 (D.D.C. 2009).

B.        *Plaintiff's Discrete Retaliation Claims*[4]

The Congressional Accountability Act of 1995 extended the protections of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., to employees of the legislative branch.  2 U.S.C. § 1302(a)(2).  The Act also contains its own anti-retaliation provision making it

> unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter.

*Id.* § 1317(a).  Claims arising under this provision are analyzed under the same framework as Title VII retaliation cases.  *Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 74 n.13 (D.D.C. 2011).  Thus, retaliation claims based on circumstantial evidence, like the Plaintiffs' claims, trigger the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  Under this framework, "a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Id.*  "If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions."  *Id.*  If the employer proffers a non-discriminatory explanation for the conduct at issue, the burden-shifting framework "disappears," and the Court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action

---

[4]    Throughout her briefs, the Plaintiff attempts to add new claims and theories of retaliation not set forth in the Complaint.  It is axiomatic that the Plaintiff cannot amend her Complaint by the briefs in support of or in opposition to a motion for summary judgment.  *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service*, 297 F.Supp.2d 165, 170 (D.D.C. 2003).  Therefore, the Court addresses only those legal claims and materially adverse actions identified in the Complaint.

and other evidence of retaliation." *Id.* (citation omitted).

As set forth *supra*, Section I.C., the Plaintiff has brought five discrete claims of retaliation against the Defendant. The Defendant does not dispute that the Plaintiff engaged in protected activity for purposes of the Congressional Accountability Act. The Court assumes the temporal proximity between the Plaintiff's protected activity and the events at issue is sufficient to satisfy to demonstrate a causal link between each purported adverse action and the Plaintiff's protected activity.[5] The dispute between the parties rests primarily on whether the actions at issue were materially adverse and whether the Defendant's proffered non-discriminatory explanation for each act is a pretext for discrimination. The Court addresses the Plaintiff's retaliation claims in turn.

### 1. Count I: Search of Plaintiff's Coat Pocket

Count I of the Complaint alleges that Ms. Heslep and Ms. Miller searched the Plaintiff's coat pocket in retaliation for the Plaintiff's protected activity. The Defendant raises a number of arguments, but the Court need only reach one: the Plaintiff failed to present sufficient evidence from which a reasonable jury could conclude that the stated reason for searching the Plaintiff's coat was a pretext for discrimination. The Defendant argues Ms. Miller and Ms. Heslep searched the Plaintiff's coat because they believed the Plaintiff was surreptitiously taping conversations in the Training Branch office. The Plaintiff herself points out that "there is no evidence of hostility

---

[5] The Court makes no finding regarding the Plaintiff's claim that she engaged in "on going and continuing participation in protected activities," such that "at no time since submission of her first Request for Counseling on February 6, 2009, has Plaintiff *not* participated in protected activities." Pl.'s Mot. at 5, 7 (emphasis added). The Defendant argues that the Plaintiff had to be actively involved in the counseling and mediation of her various complaints in order to claim she engaged in protected activity after the date on which a particular request for counseling was submitted. Def.'s Opp'n at 27-29. Even if the Defendant is correct, with the exception of Case No. 09-CA-80, the record is silent as to what extent the Plaintiff participated in the grievance procedures, counseling, and mediation regarding her requests for counseling.

between the Plaintiff and Ms. Heslep" prior to this incident. Pl.'s Resp. Stmt. ¶ 11. Nor is there any evidence that Ms. Miller harbored any retaliatory animus against the Plaintiff based on the Plaintiff's protected activity. To the contrary, Ms. Miller submitted a statement in support of the Plaintiff regarding the August 2008 incident involving the Plaintiff and Mr. Hayleck that was at issue in *Harrison I. Id.* The Plaintiff suggests the Defendant's explanation for the search is pretextual because neither Ms. Miller nor Ms. Heslep ever reported their suspicion to management or the Capitol Police. Pl.'s Opp'n at 10. Ms. Heslep testified that she had discussed the Plaintiff's suspicious behavior with Ms. Bailey. Heslep Dep. 54:1-55:6; 77:1-7. Moreover, as explained *supra*, Section III.A., the Court draws the adverse inference that the Plaintiff was in fact surreptitiously recording her co-workers' conversations. The Plaintiff also argues that the eighteen business days that elapsed between the Plaintiff's return to the training division and the discovery of the recording device was not enough time for Ms. Miller and Ms. Heslep to develop any real suspicions. Pl.'s Opp'n at 11. Notably, the Plaintiff does not present any evidence---through her own declaration or otherwise---disputing the odd behavior observed by Ms. Miller and Ms. Heslep, including that the Plaintiff announced she was going to hang her coat on the rack between Ms. Miller's and Ms. Heslep's desks. On this record, no reasonable jury could conclude, based solely on temporal proximity to protected activity and short time frame between Plaintiff's return and the search, that the Defendant's proffered explanation for the search was a pretext for discrimination. Accordingly, the Defendant is entitled to summary judgment on Count I.

2.     Count II: Purported Violation of Procedural Rule 2.03(m)

The Plaintiff alleges that in retaliation for the Plaintiff's protected activity, the EEO/CP failed to comply with Procedural Rule 2.03(m) when handling the Plaintiff's request for

counseling in case number 09-CV-80. Specifically, the Plaintiff alleges that the EEO/CP failed to provide a final decision from the Architect of the Capitol himself, and failed to notify the Office of Compliance that a final decision concerning the grievances procedures had been issued, in violation of Procedural Rule 2.03(m)(4). Pl.'s Mot. at 4, Pl.'s Opp'n at 14. The Defendant argues that the Plaintiff failed to exhaust her administrative remedies with respect to this claim.

"A civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation." 2 U.S.C. § 1408(a). The counseling and mediation requirement of the Congressional Accountability Act is jurisdictional. *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009). Therefore, the Plaintiff has the burden to show she exhausted her administrative remedies with respect to this claim. *Koch v. Walter*, --- F. Supp. 2d ---, 2013 WL 1290975, at *4 (D.D.C. Mar. 30, 2013). The Plaintiff contends that this claim was raised in the request for counseling in case number 10-AC-28. Pl.'s Opp'n at 12. However, the Plaintiff did not provide the request for counseling or any other documentation showing the Plaintiff raised the issue of the purported violation of Rule 2.03(m). The only evidence regarding the Plaintiff's request for counseling in case number 10-CA-28 is a "Notice of Invocation of Mediation" from the Office of Compliance, which describes the request for counseling as "alleging hostile work environment and denial of terms and conditions of employment because of reprisal." Def.'s Ex. 15-D at 3. On this bare record, Plaintiff's claim arising out of the alleged violation of Rule 2.03(m) could not reasonably have been expected to be encompassed within an administrative investigation if one followed the Plaintiff's request for counseling. *Park v. Howard Univ.*, 71 F.3d 904, 907 & n.1 (D.C. Cir. 1995). The Plaintiff failed to meet her burden to show she exhausted her administrative remedies regarding Count II, accordingly the Court lacks jurisdiction over this claim.

### 3. Count III: March 8, 2010, Proposal to Reprimand

The Plaintiff alleges in Count III of the Complaint that the March 8, 2010, proposal to reprimand the Plaintiff was retaliatory. The Plaintiff concedes that the proposed reprimand was subsequently withdrawn, she did not lose any pay because of the proposal, and she was neither suspended nor demoted as a result of the proposal. Harrison Dep. 72:6-16. The Defendant argues, among other things, that the proposed reprimand was not a materially adverse action. Def.'s Mot. at 16-18. The Court agrees. In *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008), the plaintiff alleged that his supervisor issued the plaintiff a letter of counseling and a letter of reprimand in retaliation for the plaintiff's protected activities. *Id.* at 1199. The court held that because the letters "contained no abusive language but rather job-related constructive criticism," the letters did not constitute materially adverse actions. *Id*. The *proposed* reprimand of the Plaintiff did not amount to a material adverse action. *Cf. Id.* (finding proposed *suspensions* were not materially adverse actions). The fact that David Ferguson did not withdraw the proposed reprimand for several months is immaterial because he ultimately withdrew the proposal before the Plaintiff filed suit. *Taylor v. Small*, 350 F.3d 1286, 1293-94 (D.C. Cir. 2003) ("An employer may cure an adverse employment action - at least one of the sort here alleged - before that action is the subject of litigation."). Therefore, the Plaintiff failed to establish a prima facie case of retaliation based on the March 8, 2010, proposal to reprimand the Plaintiff, and the Defendant is entitled to summary judgment on this count.

### 4. Count IV: March 3, 2010, Request for Protocol for Acquiring Access to Plaintiff's Computer

Count IV alleges that on March 3, 2010, Ms. Drake and Ms. Heslep asked the Information Security Division the protocol for obtaining access to Ms. Harrison's computer. As with the Plaintiff's other claims, the Defendant raises a number of arguments, including that this

conversation was not a materially adverse action.

> Materially adverse action would dissuade[] a reasonable worker from making or supporting a charge of discrimination. Typically, a materially adverse action in the workplace involves a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. Such actions demonstrate an objectively tangible harm.

*Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (citations omitted). Glaringly absent from the Plaintiff's pleadings is any explanation as to why this action was materially adverse. According to Ms. Drake's testimony, Ms. Heslep's testimony, *and* the anonymous letter sent to the Plaintiff, Ms. Drake and Ms. Heslep merely asked what the *process* would be to obtain access to the Plaintiff's computer. There is no evidence that Ms. Drake or Ms. Heslep asked the Information Security Division to hand over the Plaintiff's passwords or to provide access to the Plaintiff's computer without adhering to protocol for such requests. Moreover, neither Ms. Heslep nor Ms. Drake actually gained access to the Plaintiff's computer on that day, and neither individual sought formal approval to obtain access to the Plaintiff's email until the Plaintiff took sick leave on March 30. In this case, the inquiry by Ms. Drake and Ms. Heslep as to the official protocol for obtaining access to the Plaintiff's computer did not cause the Plaintiff any objectively tangible harm or result in a significant change in employment status. No reasonable jury could conclude the conversation at issue constituted a materially adverse action. Thus, the Defendant is entitled to summary judgment on Count IV.

### 5. Count V: March 29, 2010, Performance Improvement Plan

In Count V, the Plaintiff alleges the March 29, 2010, Performance Improvement Plan---issued by Ms. Heslep the day before the Plaintiff took an extended leave---was retaliatory. Ultimately the plan was never implemented: Ms. Bailey withdrew the plan while the Plaintiff was on sick leave, and declined to reinstate the plan upon the Plaintiff's return because the

Plaintiff's new supervisor was not familiar with the Plaintiff's past performance. The Defendant argues that the plan did not constitute a materially adverse action. The D.C. Circuit has concluded that a performance improvement plan that exposes a plaintiff to removal, reduction in grade, or withholding of within grade increase may be a materially adverse action. However, the Plaintiff conceded in her deposition that she was never actually placed on the performance improvement plan. Harrison Dep. 96:20-97:3. Thus the Plaintiff was never at risk of demotion or termination. To the contrary, the Plaintiff received her scheduled within grade increase effective October 24, 2010. Pl.'s Mot. at 43; Pl.'s Ex. 49 (Notification of Personnel Action).

This case is more akin to *Taylor v. Small*, 350 F.3d 1286 (D.C. Cir. 2003). The *Taylor* court found that although the issuance of the performance improvement plan delayed the plaintiff's performance evaluation, absent any claim that the plaintiff suffered any adverse effects, placing the plaintiff on a performance improvement plan was not an adverse action. *Id.* at 1293. Here, the performance improvement plan was never implemented because the Plaintiff went on extended sick leave the day after the plan was issued. Upon her return to work, the Plaintiff received her within grade increase without any delay. In theory, a performance improvement plan could adversely affect an employee, but the Plaintiff failed to produce any evidence to suggest the plan at issue in any way altered the terms of her employment, much less significantly so. In this instance, the issuance of a performance improvement plan---that was never ultimately implemented---does not constitute a materially adverse action.

Assuming the plan constituted an adverse action, the Defendant has proffered a legitimate, non-discriminatory justification for the plan, namely the Plaintiff's deficient work performance. The Plaintiff relies entirely on her subsequent performance evaluations to demonstrate the Defendant's proffered explanation is pretextual. Peggy Hernandez, who became

Chief of the Training Division after Ms. Poole's term as acting Chief, rated the Plaintiff's performance as "fully successful" during the Plaintiff's 2010 and 2011 performance reviews. Upon closer inspection, the reviews reflect several of the same performance deficiencies discussed in the performance improvement plan. For example, much of the performance improvement plan focused on the Plaintiff's handling of the Architect's Mobility Program, or "AMP." Specifically, the plan faulted the Plaintiff for "[n]ot proactively managing the Architect's Mobility Program (AMP)." Pl.'s Ex. 37 at 2. Ms. Hernandez also found that the Plaintiff "failed to effectively plan the appropriate plan of action for her coordination of the AMP revitalization program," "continue[d] to be ineffective in facilitating meetings to meet project requirements," and consistently sought guidance and approval for each specific task rather than working independently. Pl.'s Ex. 42 at 18-19. Similarly, in the performance plan Ms. Heslep criticized the Plaintiff for delivering poorly written work product. Pl.'s Ex. 37 at 2. Ms. Hernandez reported that the Plaintiff "display[ed] more inadept writing skills that [sic] are definitely in her capability as a Training Specialist." Pl.'s Ex. 42 at 17. In other words, nearly two years after the plan was issued by Ms. Heslep, a new supervisor---who the Plaintiff does not allege had any retaliatory motive---reported many of the same issues with the Plaintiff's performance that were at issue in the plan. On this record, no reasonable jury could conclude the Defendant's stated reason for issuing the performance improvement plan was a pretext for discrimination. Thus on either of two independent grounds, the Defendant is entitled to summary judgment on Count V.

### C. *Plaintiff's Hostile Work Environment Claim*

The Plaintiff alleges in Count VI that the discrete acts at issue in Counts I through V together constituted a retaliatory hostile work environment. In this circuit, a hostile work

environment may amount to retaliation under Title VII. *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). When the alleged harasser is the employee's supervisor, the employer is vicariously liable to the employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).[6] To establish a prima facie Title VII hostile work environment claim, the Plaintiff must show: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her protected status; and (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment. *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002); *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). The third and fourth elements are the focus of the Defendant's motion for summary judgment.

A workplace becomes "hostile" for purposes of Title VII only if the allegedly offensive conduct "permeate[s] [the workplace] with discriminatory [or retaliatory] intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (citation omitted). This standard has both objective and subjective components: the work environment must be one that a reasonable person in the plaintiff's position would find hostile or abusive, and the plaintiff must actually perceive the environment to be hostile or abusive. *Id*. The objective prong requires the Court to evaluate the "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its

---

[6] However, "[w]hen no tangible employment action is taken," the employer may raise an affirmative defense comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher*, 524 U.S. at 787–88). "[A] few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

The Plaintiff argues the events at issue in *Harrison I* and discussed in Counts I through V constituted a retaliatory hostile work environment. The Court granted summary judgment in favor of the Defendant in *Harrison I* in relevant part because the Plaintiff failed to produce any evidence that the events at issue were motivated by a retaliatory animus. *Harrison I*, 2013 WL 4666110, at *5-*8. Furthermore, as explained above, the Plaintiff failed to produce sufficient evidence from which a reasonable jury could conclude that the search of the Plaintiff's coat or issuance of the performance improvement plan were motivated by retaliatory animus. Thus, the events that may comprise[7] the Plaintiff's hostile work environment claim are listed below, in chronological order:

- On May 8, 2009, the Plaintiff was informed by Ms. Tiscione her temporary detail would end and she would be returning to the Training Branch in June;

- On or about October 30, 2009, Ms. Bailey and Mr. Cassil instructed the Plaintiff not to bring a recording device to the workplace;

- In late October/early November 2009, the EEO/CP issued a final decision regarding the grievance procedures from the Executive Director rather than the Architect of the Capitol, and did not send a formal notice of the decision to the Office of Compliance;

- On March 8, 2010, Ms. Heslep issued a proposal to reprimand the Plaintiff; and

---

[7] The Defendant has also argued that none of these events were motivated by a retaliatory animus. The Court did not need to reach that argument to resolve Counts I through V, and makes not finding as to whether the Plaintiff proffered sufficient evidence to show any of the events listed in this section were retaliatory.

- On March 10, 2010, the Plaintiff received an anonymous letter indicating Ms. Heslep and Ms. Drake inquired into the procedure for obtaining access to the Plaintiff's computer.

Considered as a whole, no reasonable jury could conclude these events amounted to a hostile work environment. The Plaintiff was re-assigned to the Training Branch in the summer of 2009, but did not physically return to the Training Branch office until after Mr. Hayleck left to take a position with a different federal agency. The Plaintiff was instructed not to bring her recording device to the workplace, but (per the adverse inference) was in fact surreptitiously recording her co-workers. The Plaintiff has not identified any harm or prejudice that arose from the fact she received a final grievance decision from the acting Executive Director of the EEO/CP rather than the Architect of the Capitol, and the Office of Compliance received actual, timely notice that the grievance procedures had terminated. The proposal to reprimand the Plaintiff was withdrawn by Mr. Ferguson, and did not affect the Plaintiff's pay or cause any tangible harm to the Plaintiff. Finally, although Ms. Heslep and Ms. Drake inquired as to the procedure for obtaining access to the Plaintiff's computer, they did not pursue the issue any further after the initial inquiry. Ms. Heslep was later authorized to access the Plaintiff's email while the Plaintiff was on extended sick leave, but the Plaintiff does not challenge this event in her Complaint. The events in question were sporadic, spread out over time, and involved five separate supervisors and a different division of the Defendant. No reasonable jury could conclude the purportedly offensive conduct was sufficiently severe or pervasive such that it altered the conditions of the Plaintiff's employment and created an abusive working environment.

## IV. CONCLUSION

For the foregoing reasons, the Court finds the Defendant is entitled to summary judgment on all counts. The Plaintiff's intentional destruction of highly relevant evidence entitles the

31

Defendant to an adverse inference that the Plaintiff was surreptitiously recording her co-workers' conversation. No reasonable jury could conclude that the Defendant's proffered non-discriminatory explanation for the search of the Plaintiff's coat was a pretext for discrimination. The Court lacks jurisdiction over the Plaintiff's claim that the Defendant's violation of Procedural Rule 2.03(m) was retaliatory because the Plaintiff failed to exhaust her administrative remedies. The Plaintiff failed to proffer sufficient evidence from which a reasonably jury could conclude the March 8, 2010, proposal to reprimand the Plaintiff and March 3, 2010, inquiry into the process for obtaining authorized access to the Plaintiff's computer were materially adverse actions for purposes of a retaliation claim. The Plaintiff likewise failed to demonstrate that the issuance of the performance improvement plan was a materially adverse action, nor did the Plaintiff rebut the Defendant's legitimate, non-discriminatory explanation for the issuance of the plan. Finally, no reasonable jury could conclude that the purportedly hostile actions, viewed as a whole, were sufficiently severe or pervasive so as to create a hostile work environment. Accordingly, the Defendant's [48] Motion for Leave to File Motion for Sanctions is GRANTED, the Defendant's [48-3] Motion for Sanctions is GRANTED IN PART and DENIED IN PART, the Defendant's [44] Motion for Summary Judgment is GRANTED, and the Plaintiff's [42] Motion for Summary Judgment is DENIED.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE